This is Wayne Land and Mineral Group v. the Delaware River Basin Commission, and this is on behalf of the Intervenors Council. Good morning, Your Honors. Matt Havristic for Senator Pro Tem of the Pennsylvania Senate, Joe Scarnati, and Senators Gene Yaw and Lisa Baker. I'd like to reserve three minutes of my time, please. Your Honors, when this Court sent back down to the Middle District the first time around this case, it was to decide a question that is of the answer which is going to be of critical importance, potentially, and particularly large and significant import to the General Assembly, specifically a definition of a term that has the ability, potentially, to impact the constitutional obligations that the legislative branch has. Under circumstances like that, it's difficult to see how the Senators, either as the Pro Tem who is the Speaker of the entire body or in their individual capacity, don't have a significant interest in this case. One of the issues here, is it the same interest as the Wayne Land and Mineral Group? They're radically different interests, aren't they? Well, I don't think they're radically different. I think that they are different enough that it's appropriate for the Senators to be in the case. The wherefore clauses, if that's what we want to talk about, of the relief both seek, look similar enough to everyone, I think, even the judge below that didn't count one. Everybody understood we were asking for the same things. Is there total unanimity of interest, though, between the Senators and Wayne Land Group? Not necessarily. Wayne Land Group, potentially, could be set aside in the litigation outcome that only affects Wayne Land Group, and that is the area of geography that they own. On the other hand, the interest of the General Assembly, the Senate and the House, the two constitutional parts thereof, goes to the broader question of, does the commission have the ability to strip away legislative authority for a whole swath of both geography and subject matter, that is, all of the geography up and down the Delaware River, and in terms of at least natural gas drilling, that topic area for legislation. And depending on how the term project is defined, yes, it does. It does take away every Senator, every House of Representatives representative, the ability to cast a meaningful or effective vote on anything having to do with natural gas drilling within the Delaware River. Would that apply to every Senator from the various constituent states of the commission? Would every Senator have a similar interest? I think so, if they wanted to join. But they haven't sought to intervene. The only representatives of any part of the Commonwealth of Pennsylvania, executive branch, legislative branch, who have attempted to intervene at least at this point are the pro tem and the two Senators who have separate and some interlocking and some very different interests in why they should be in the particular litigation. Okay. Did the district court do a Conochester analysis on standing? It appears to have done so, Your Honor, and the outcome is on count one, there wasn't a need to have the analysis because, at least by implication, the court below determined that Waineland Group and the Senators were asking for essentially the same relief. On count two, it appears to have, and I think that's the analysis you're talking about, on count two it did do that analysis and determined, well, the interests are different, therefore the Senators need to establish standing on count two. Do you agree with that? Well, for sake of argument, I'll say this. I think that in the event that that analysis requires a standing, to the extent that a standing analysis is required for count two, I think that there is a concrete injury to Senator Scarnati, Senator Baker, Senator Yaw, such that they would have standing. I'm not sure that the relief asked for in count two really is all that different from the relief in count one in very practical terms. The net effect of granting the relief that the Senators asked for in count two probably leads to exactly the same result, which is the Commission does not impose or cannot impose a moratorium. Count one says we're not. Was it a concrete injury that would befall the Senators? Well, so I think there are two. I think you can put them in very broad classes, and I think you can use this analysis for both standing, which I don't think we need to do for count one, or for the interests of them in terms of intervention. The first is their status as members of half of the General Assembly and their votes and whether those votes can be cast in an effective way. This is not a situation where it's an after-the-fact fight about legislation that maybe you lost on, maybe you didn't win on. If the view of the word project and the prevailing view of apparently the Commission is the result of a trial below, that means that on any vote that the Senators would ever cast that would be inconsistent with a moratorium or whatever rules the Commission imposes for the Delaware watershed would be a nullity. There would be no point in making those votes because they were already overridden by the Commission. That in itself, I think, gives a generalized interest to each of the Senators and I think probably the House members, too, if they wanted to get in the case. But in particular, leadership, Senator Scarnati is the pro tem, has an institutional interest, which he frequently has to defend when he's a defendant in Article III lawsuits in which he, in turn, has been recognized to have, as have other leaders in the Senate, when they are suing over institutional concerns. And that is the diminution or the potential diminution of the constitutional authority of the body. The court. I'm not sure I understand that. Here's what I mean by that, Your Honor. The question now being sent down to the district court is, does this term project, is it expansive or is it narrow? The district court has that in front of them right now. Yes. And one of the things that the district court specifically was charged to do was determine what was the intent of the General Assembly. Did the General Assembly, again, you have to think of the General Assembly as really what it is, two constituent bodies, the Senate and the House. So did the Senate intend to cede a significant amount of legislative authority to an extra state body? Now, query whether it could do that under Article III in the first place. But that interest, that is, whether the body intended or did or could have even given away a substantial amount of its legislative authority to somebody else is something that routinely gives leadership of the Senate, at least the pro tem and also the speaker when there's a constitutional fight, standing to get into a lawsuit on behalf of defending the institutional interest. It happened in a line item vote in the one that started with Corbett and then went to Governor Wolk. If you want to create a commission to effectuate certain activities in the Delaware River Basin, what's the point of doing it if you're going to allow the legislatures of the four states to second-guess everything you do? Well, I don't think it's a question of second-guessing. At least as framed by this court and as I think framed by Wayne Land Group, it's a question of what did they intend to do, they, the legislature, the Senate and the House. And it was a Senate bill that ratified the compact and ran it through the legislature. What did they intend? What did the bodies intend to give away as their authority? Are we the ones to say that? Well, I don't think you're being called on to say it yet, Your Honor. We can, in fact, pick up that discussion and put it over to the side because the only thing we need to think about right now is whether that question gives a significant enough interest to the pro tem of the Senate that warrants his inclusion so he gets a voice in this lawsuit. So because of the existence of this dispute between the commission and Wayne Land Company, so the Senate now knows that the Delaware River Basin Commission is, you know, taking a proactive stance to block the use of the Wayne Company land for oil and gas drilling. They know that, okay? Can the Senate institute through legislation a bill to change the compact? It could do that, but it doesn't have the unilateral ability to control the outcome of that legislation, even within the contours of Pennsylvania. Let's say that happened, Your Honor. Let's say Senate Bill 1 of the next session was a bill to withdraw from the compact or say, well, we're not. Withdraw, to modify the compact to say that the Delaware River Basin Commission, in trying to protect the water supply of the lands within the four states, may not have the authority to determine whether or not someone can drill for natural gas. Senate Bill 1 says that. Passes the Senate. Passes the House. Governor signs it, and he has a parade. Okay. What does that do? Nothing. Besides being a bill that was signed. Nothing. Because the compact can't be amended simply by, even if you accept that it's appropriate for the, and I think it's fair to say that it is, for the Senate of Pennsylvania or whoever's running that bill to go push it in the House and push it on the governor, that's as far as it can be taken. It's probably not appropriate, or I'm not even sure how it would be done, for a bill like that to become law in Pennsylvania and then have the senators or the Senate or the House or even the governor go around and try to lobby for other legislatures to do the same thing. And then what I think that leads to, ultimately, is the same thing that I started out the question with, a withdrawal from the compact. And nobody wants that either. And it may be, it may be that there's a determination at the end of the litigation that the intent of the General Assembly and the intent of the Senate and the intent of the House was to cede some portion of sovereignty and some portion of legislative authority. I mean, I'm not prejudging the outcome of it, but I think the fact that the senators weren't there at the time the legislation passed doesn't diminish at all their interest in whether that body today is about to have to live by a middle district opinion that strips it of a lot of its legislative authority. And let me close with this. Wouldn't this more properly be a role for the State Attorney General? Well, I don't know if it would or wouldn't, but he's not here, Your Honor. Well, answer my question. No, not necessarily. Why would not the State Attorney General have the ability to attempt to get the law that created the compact properly enforced? Well, I think you're asking a different question than the one I'm trying to answer, but the one I think is the appropriate answer. The issue for the Senate is not just the interpretation of the contract. The issue for the Senate and the legislature is an interpretation of the contract that radically diminishes legislative authority. Query whether the governor has a sufficient interest to care about that issue or the Attorney General, and in fact, and this is a case I did last year in Commonwealth Court, the Phantom Fireworks case where there was a non-delegation issue raised. The pro tem was a named party. The speaker was a named party as a defendant. The Attorney General was not. I actually made the argument, well, the Attorney General is a necessary party in this lawsuit. The Commonwealth Court said, no, he's not. No, he's not. It doesn't have anything to do with, you don't need him in this case. You're talking, the plaintiffs are suing you over whether you violated Section 31 of Article 3. He doesn't have anything to do with it. He's not a necessary party. Neither is the government. Allow me to leave the court with this, and then I'll sit down unless you have any more questions for me. The core issue for today is whether the senators have expressed a sufficient enough interest to belong in this case as interveners. What that means for the positions they take or anything else is for another day. I posit to this court that the district court has already set the floor for what a sufficient interest is, and it did so when it allowed the Delaware River Keepers Network into the case. That's a fine, laudable organization, but essentially a club that has members who in a very generalized, non-particular way care about the Delaware River. It seems inconceivable to me that now that the case has matured to a point where we are talking about the intent of the Senate, at the time Senate Bill 850 ran, and whether that intent was to radically strip away legislative authority, it seems inconceivable to me that the president pro tem of the Senate, the office that will have to live with a result that potentially could radically strip away legislative authority from the body, doesn't have an interest of a quantum or quality at least coextensive to the Delaware River Keepers Network, if not far superior. So you're saying we shouldn't focus on standing? I don't think it's necessary. It's certainly not necessary for count one, Your Honor. And I think if you answer the interest question in the affirmative, I think we're really, my argument would be the same if we had a standing argument for count two as it is for the intervention argument. It really all boils down to the same idea. Do we have a sufficient stake as the senators in this? Not a generalized, we want a particular result, but is there something concrete that we care about that we can be hurt by depending on how this lawsuit goes? And I think, again, the arguments you'd make would be the same for count two standing as they would be for the interest prong of the intervention piece. Thank you. Mr. Warren. Good morning, Your Honors. I'm Kenneth Warren representing Appellee Delaware River Basin Commission. May it please the Court. In 1960, the four Delaware River Basin states and the federal government enacted the Delaware River Basin Compact to jointly manage the water resources of the basin without regard to political boundaries. The compact created the commission through which the basin states jointly exercised their sovereign authorities over the region's water resources. Congress consented to this arrangement and included the federal government as a member of the commission with an equal vote. This experiment in cooperative federalism has served the parties to the compact well for almost 60 years, including protecting the drinking water resources of 13 million people. The purpose of the temporary moratorium, that's what they're challenging in this case, the temporary moratorium in place today is to protect these important water resources until the commission can put permanent regulations in place. Now, the compact itself says who the representatives are of Pennsylvania. The governor of Pennsylvania is designated ex officio as the commissioner, as are the governors of all of the other basin states and a representative of the president. Each of these ex officio members are politically accountable. We're not talking about an independent agency that acts without independent accountability. You can't have much more responsibility to the electorate than being the governor. Now, the senators must demonstrate standing because the relief that they seek on both counts is different from the relief that is sought by wing. So going back to Judge Fisher's initial question, did the district court do a town of Chester analysis in this case? The district court mentioned standing. I don't think there was a full town of Chester analysis. Should there have been? Yes, there absolutely should have been because standing goes to the jurisdiction of the court over these claims, and where the relief that's being sought by an intervener is different from the relief that's being sought by the plaintiff. Town of Chester teaches us that the interveners need to have independent standing, and their independent standing has to be looked at separately for each of their counts. So that's really a gateway. That is a gateway question for the district court and for us, is it not? Yes, Your Honor. Can we do that? I believe that you can compare the relief that's being sought by the interveners with the relief that's being sought by the plaintiff and conclude they're different and, therefore, that a standing analysis is necessary. And I think on count two, with respect to a takings claim in which damages are being sought, there's clearly no standing for individual senators to do that. And, likewise, there's no standing for individual senators to attack the moratorium. The moratorium results from two acts, the act of the executive director in requiring all fracking companies to come in and get approval, and the action of the commissioners themselves in saying, well, we're not going to grant those approvals until we look at the science very carefully and establish a set of regulations that we deem to be safe to protect water supplies and other water resources. What we know is that individual legislators do not have standing to challenge the implementation of a statute, and that is exactly what the senators are trying to do here. What about Senator Yaw's claim that the moratorium is going to have an impact on the well fund, which, as chairman of the Senate Environmental Resources and Energy Committee, he has oversight responsibility for? Senator Yaw receives a report on the well fund. That's what his statutory responsibility is. There is nothing in either the internal Senate regulations or statute that gives Senator Yaw the ability to sue if he doesn't like what's happening to the well fund by some external factor. But that certainly could be construed because the law requires the Public Utility Commission to provide a report of the well fund to a specific senator by virtue of his committee chairmanship. That would certainly at least be an indication of oversight responsibility for whatever oversight responsibility means for this case. Well, I think that the committee itself does take a look at the well fund. But what Senator Yaw is attempting to do here is to say that because he has the ability to receive reports, which, by the way, given the temporary moratorium, he continues to receive. It hasn't interfered with his reports at all. Somehow that gives him authority over all drilling activity in the Commonwealth. And while the legislature certainly has an interest past Act 13 in looking at drilling activity in the Commonwealth, Senator Yaw has no particular right to intervene and express his own individual views whenever drilling activity is initiated. In fact, if your action, I take it his argument is that if the commission's action impacts the number of people who are drilling, that is going to impact the amount of revenue coming to the well fund. Correct. That's his argument. And isn't that a concrete interest? It's not a concrete interest of Senator Yaw's. I would say that the Commonwealth has a concrete interest, not arguing that the Commonwealth can't express its views in this case, but an individual, Senator Yaw, can't intervene in litigation, express his own views about whether or not a temporary moratorium designed to protect water resources in the basin will somehow interfere with the well fund. And, you know, what the senators are also saying is that, you know, somehow any activity that curtails what the Senate can do, quote, usurps their authority. But what we have here is really a supremacy clause case because the compact is a federal statute in addition to being state statutes. And what the commission does by way of imposing a moratorium has precedence over state law. That's why the senators are complaining that they can't develop fracking at the Wayne site because this moratorium is in effect. Well, what we know from cases such as Roe against Casey or National Collegiate Athletic Association is that senators cannot intervene, any legislature cannot intervene to say that a federal statute or the federal constitution should be narrowly construed in order to protect their so-called authority to legislate further. The supremacy clause is what is limiting them here. However, it is with the consent of the governor of Pennsylvania that this is being done. Individual senators. Going back a second to Senator Yaw and his role, doesn't the case, at least as far as state law is concerned, I think state law does play some role here on our intervention question. Doesn't the case of Corman versus the NCAA support Senator Yaw's request? You know, I think that where, are you referring to the case of the penalty on Penn State? Yes. What was going on there federally, because there's two cases, there's a state case and a federal case. Right. And they came to different results. And the reason they came to different results is in the federal case the court understood that trying to narrowly construe a federal action is not a function of an individual state legislator. I understand that, but in the state case the Commonwealth Court said that Senator Corman can intervene and become part of that case to determine where the NCAA fine was going to go. Well, that's what the state court said, but I think for standing purposes the federal court case is really what's controlling. You don't have an interest that's protected under the standing doctrine simply because you would like the funds to go somewhere else. And if Senator Yaw had a right to allocate those funds, if somehow he were imbued with that authority by the legislature, I think the answer would be different. But he does not have that right here. His only right is to review a report and take an action as a member of a committee, which then gets reflected in the General Assembly. So I'd like to make just a couple of other quick points here. The first is that under this trustee doctrine that the PDF case set forth, it is entities of the Commonwealth that are trustees, not individual legislators. Because if each individual legislator himself or herself were a trustee, then any time there was an interest in natural resources that was being allocated or regulated in some way, you could have hundreds of individual legislators deciding to step in and voice their own individual views. And you could have hundreds of municipal officials stepping in to give their own views. It is the Commonwealth's position that matters. And, Judge Fischer, as you said, it is the Attorney General who should be stepping in on behalf of the Commonwealth if, in fact, the Commonwealth believes that the DRBC is doing something to protect water resources that goes beyond its authority. In addition to the trustee point that's being made, I'd note that Governor Wolf has separately prohibited leasing on state lands. There's an executive order issued in 2015, Executive Order 2015-03, that prohibits natural gas leasing on state lands. And so to the extent that the senators are claiming as trustees they want to see public lands developed, their quarrel again is with the governor, not with the DRBC. But this isn't public lands. This is Wayne Land Company's land. Correct. And over which the senators have no trustee relationship because they're conceding that it's Wayne who should be developing the natural gas and Wayne who gets the proceeds from that. Yeah, but they're arguing that they should have the permitting right, not the DRBC. You know, that's correct. And whether or not DRBC will choose to permit this, whether DRBC will choose to regulate it, or whether the effects on water resources are so severe that DRBC needs to prohibit it, that's what's at issue in the regulations. And we'll know an answer to that relatively soon, but that's not what's at issue here. The only question here is whether a temporary moratorium can be imposed until DRBC goes through the science, which involves extensive EPA reports, extensive reports by the state of New York, to determine whether or not this activity can occur safely in this basin where there are 13 million people, including all the people in the city of New York, all the people in the city of Philadelphia, all the people in the city of Camden, relying on us to protect those water resources. I mean, we heard a landfill case just recently, and the question is what happens when the regulatory agency is not doing its job. We're trying to do our job the best we can to make sure that we keep things in place until we get through the science, and when we get through the science, through the normal comment and response process, we will adopt regulations, and then people will decide if we acted arbitrarily or not. But we're trying to do our best to get it right, Your Honor. Use our cases. We've had enough difficulty keeping these cases. Well, I was just sitting here thinking, like, what if the DRBC had sat back and let this go forward, and all of a sudden we have a public nuisance case that Wayne Land and Mineral Company is polluting the groundwater, and people would say to the DRBC, where were you? It's too late to file an amicus on that case. Mr. Yeager. May I conclude, Your Honor? Sure. You know, in conclusion, the Senators' intervention motions have twice been denied by the district court, and they were once denied by this court on the last appeal when the Senators tried to intervene. The case has proceeded through fact discovery, and expert discovery is ongoing. Because the complaint they seek to file requests relief and presents issues different from plaintiff's complaint. And if you look back at the Third Circuit opinion, it said that the plaintiff is not challenging the moratorium. It said it expressly in the decision. That's not what's being challenged in the plaintiff's case. Because they present different issues, the Senators must satisfy each element of standing, as well as each element of Rule 24A. And as the district court recognized, the Senators' complaint would introduce damages and takings issues that would delay the case, prejudice DRBC, and delay this litigation. The compact designates the governor, not the individual members of the Senate, to speak for the Commonwealth. The court should affirm the district court's decision denying intervention. Thank you, Mr. Moore. Mr. Yeager. Thank you. May it please the Court. Jordan Yeager from Kirtland Hefner on behalf of Intervenor Dollar Riverkeeper Network. I'll be brief because I think most of the issues have been addressed, but I do want to hit a couple things in particular. Judge Fischer, in response to your question, as you know, under the Attorney General's Act at 71PS Section 732, 201A and 204C, the General Assembly has enacted a law signed by the governor that said that when there is litigation and there is a role for the Commonwealth to play in that litigation, that role is to be played by the Attorney General. It is not, and the General Assembly conceivably and the governor conceivably could have signed a law that vested that authority in the president pro tem of the Senate. That's not what the General Assembly deemed appropriate. What the General Assembly also deemed appropriate and what was also signed into law by the governor was the compact itself. And the compact itself is really, and the litigation that enshrined that compact, not just into Pennsylvania law but into the law of each of the signatory states and into the law of the federal government, is really what they, what the proposed intervenors here seem to object to because their concern, as expressed to this court this morning, is over what is being ceded from the legislative authority that they might otherwise have. That was a decision to cede some of that authority when Pennsylvania decided to join the compact. And one can look at the purposes of the compact, and I won't quote it here,  is that there are some resources of our nation that are interdependent, that you can't simply regulate from the view of one member state. They have to regulate from the view of the signatory states and the federal government. The Commonwealth of Pennsylvania determined that it was in the Commonwealth's interest to join in that compact, recognizing that interdependent interest that we all share. What the legislators who appear before you today may wish to do is to back out of that compact. And that's a political question for the legislators individually, but ultimately collectively and the governor collectively to agree to. And what we see throughout this effort to intervene is a conflating of the role of an individual legislator with the role of the Commonwealth as a whole. And we see it in their seating and their attempt to take the role of the Attorney General, and we see it in their attempt to effectively undo Pennsylvania's joining into the compact. So we ask you to affirm the district court. Thank you. Thank you. Governor Stig? Thank you, Your Honors. I hate to correct my learned colleague to my left, but I do want to make an important point. The governor's moratorium on natural gas drilling in public lands is not all public lands. It does, for instance, does not include state game lands, of which there are a significant amount in the Delaware River watershed. So this is a live issue. With respect to Senator Yaw's as chairman of that committee, he's not just Senator Gene Yaw from Williamsport. He's the chairman of the relevant committee. And I think that accords different weight to him than simply a status of senator. He does have oversight over potentially revenue-generating resources right now in the Commonwealth. I thought that was an important point to make. While we're on the status of Senator Yaw, I am, as the court may or may not know, somewhat familiar with the Corman v. NCAA case, having done it. I know exactly what the issue was on Senator Corman's standing, and I think it was correctly stated by Judge Fischer. In fact, because Senator Corman had oversight authority over the particular monies covered by the fine, he was in turn given standing or courted standing to sue the NCAA over its disposition of the money. I mean, I think it's virtually identical to what's being alleged with respect to Senator Yaw in his status as chairman of the relevant committee, and that committee's oversight responsibilities over funds generated by natural gas drilling. Let me close with this. Let's not forget what the directive was from this court and why the Senate at this time has stated a significant interest. We're not yet talking about the relative merits of a moratorium or whether it's environmentally sound to allow some, none, all drilling in the watershed. The issue sent by this court back down for determination was understanding that the compact is a contract and understanding that it had to be assessed and its terms, and understanding the terms had to be assessed under contract principles. This court's specific mandate below was what is the intent of the Senate and the House, the General Assembly, when it entered into the compact, and what did it mean by the word project? What did it intend to give away in terms of authority by ratifying the word project? Is it as expansive as the DRBC maintains or is it as narrow as Wayne Land maintains? That seminal question is one that, again, I can't see how the General Assembly and the Senate in particular does not have an interest in having a voice in deciding. It's a question of what does that body understand, use of a word like project, and what does that body believe, either then, now, or sometime in the future, it can give away in terms of its legislative authority. I can think of no, frankly, question that gives a greater interest as an institution to the Senate of Pennsylvania and to its members and to its leadership. So there you go. Thank you very much. Appreciate it. Thank you, everybody, for your arguments and your briefs. We'll get back to you. Appreciate it.